UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

CLARKSON AUTO ELECTRIC, INC., et al.,

                Defendants.
_____

DECISION & ORDER

10-CR-6111CJS

       Defendants Clarkson Auto Electric, Inc., Gerald Fretto and Matthew LaVilla, among others, have been charged with conspiracy to commit mail fraud, conspiracy to commit money laundering and substantive mail fraud offenses, in violation of 18 U.S.C. §§ 1349, 1341 and 1956(h), respectively. (Docket # 1). Fretto and LaVilla also have been charged with substantive money laundering offenses, in violation of 18 U.S.C. § 1957. (*Id*.). Currently pending before this Court are Fretto's and LaVilla's motions to release certain seized bank accounts in order to permit them to be used to retain counsel. (Docket ## 67, 75, 76, 172). For the reasons discussed below, I deny the motions.

## PRIOR HISTORY

       On December 10, 2007, this Court issued a warrant authorizing the seizure of various bank accounts and other assets owned by defendants Clarkson Auto Electric, Inc.

("CAE"), Gerald Fretto, Matthew LaVilla and Anthony Fretto.[1]  On June 8, 2010, a grand jury returned the twelve-count pending indictment charging CAE – its owners, Anthony and Gerald Fretto and LaVilla – and seven former employees of Xerox Corporation ("Xerox") with the offenses described above.  (Docket # 1).  The indictment also contains two forfeiture allegations pertaining to the same assets that were seized pursuant to the December 2007 warrant.

Following their arraignments, Anthony Fretto, Gerald Fretto, LaVilla and CAE requested a post-seizure hearing pursuant to *United States v. Monsanto*, 924 F.2d 1186 (2d Cir.), *cert. denied*, 502 U.S. 943 (1991).  (Docket ## 67, 75, 76).  Specifically, they contended that without the release of some of the seized accounts, they would be unable to retain counsel of their choosing.  This Court subsequently determined that Anthony Fretto had not demonstrated that the seized funds were necessary for him to be able to retain counsel and denied his motion on that basis.  (Docket # 104 at 12).

On December 9, 2010, this Court granted the remaining three defendants' request for a *Monsanto* hearing.  (Docket # 96).  After unsuccessfully seeking reconsideration of that decision, the government appealed it to United States District Judge Charles J. Siragusa.  (Docket # 98).  On February 9, 2011, Judge Siragusa affirmed this Court's decision.[2]  (Docket # 116).

The *Monsanto* hearing was held on August 22, 2011.  (Docket # 163).  At the hearing, the government introduced into evidence the indictment, the December 7, 2007 seizure

---

[1] The warrants were executed on December 10 and 11, 2007, pursuant to which the government seized ten bank accounts with a total value of approximately $520,000, a car and a motorcycle. (Docket ## 110-1, Exhibit ("Ex.") A; 182 at 1). The government thereafter filed a civil forfeiture complaint against the seized property. (08-CV-6107).

[2] The government appealed Judge Siragusa's decision, but subsequently withdrew its appeal. (Docket ## 117, 167).

warrant and accompanying affidavit sworn by Internal Revenue Service Special Agent Erin Stacer ("Stacer") and a supplemental affidavit sworn by Agent Stacer on February 3, 2011. (Docket # 110; Tr. at 3).[3] At the hearing, defendants cross-examined Agent Stacer. (Docket # 190 at 5). The parties submitted post-hearing memoranda[4] (Docket ## 178, 179, 180, 182, 190), as well as an affidavit from CAE's certified public accountant, Franz Griswold, stating that Anthony Fretto, Gerald Fretto and LaVilla are the sole and equal shareholders of CAE. (Docket # 175).

Defendants' motions seek release of the following seized accounts:

- First Niagara Bank account number XXXXXX3581 ("FNB 3581") in the name of CAE in the sum of approximately $100,129;

- Canandaigua National Bank & Trust account number XXXXXX2668 ("CNB 2668") in the name of CAE in the sum of approximately $122,766;

---

[3] The transcript of the August 22, 2011 hearing shall be referred to as "Tr. __." (Docket # 176).

[4] Defendants have moved under Rule 612 of the Federal Rules of Evidence for production of Stacer's notes and memoranda summarizing various witness interviews, certain Excel worksheets and her grand jury testimony. (Docket # 179; Tr. 18). Stacer testified that she reviewed those materials in preparation for the *Monsanto* hearing. (Tr. 17).

Rule 612 provides that if a witness used a writing to refresh her memory before testifying, "if the court in its discretion determines it is necessary in the interests of justice, an adverse party is entitled to have the writing produced" for inspection and to cross-examine the witness. Fed. R. Evid. 612. As an initial matter, I note that the Second Circuit has observed that the Rules of Evidence do not apply in *Monsanto* hearings. *United States v. Monsanto*, 924 F.2d at 1198 ("the Federal Rules of Evidence would not be followed in the pretrial hearings that this opinion would require, thus allowing the use of hearsay testimony and precluding unwarranted exposure of government witnesses"). In addition, "a party has no absolute right" to production of a witness's notes or memoranda where that witness does not use them in court. *See Goldman v. United States*, 316 U.S. 129, 132 (1942), *overruled on other grounds*, *Katz v. United States*, 389 U.S. 347 (1967). The trial court has discretion not to order production where the witness's notes and memoranda constitute part of the government's case. *Id*.

Here, Stacer did not review or refer to the requested material in her testimony (except in response to direct questions by defense counsel about that material). Moreover, the materials are plainly relevant to an ongoing criminal prosecution. For these reasons, and considering the limited purpose of a *Monsanto* hearing, I deny defendants' Rule 612 motion.

> • Canandaigua National Bank & Trust account number XXXXXX5136 ("CNB 5136") in the name of CAE in the sum of approximately $17,365;
>
> • Canandaigua National Bank & Trust account number XXXXXX5094 ("CNB 5094") in the name of Elsie and Matthew LaVilla in the sum of approximately $19,064.

(Docket ## 67; 75-1 at ¶ 2).

Following the *Monsanto* hearing, on September 12, 2011, Gerald Fretto, LaVilla and CAE requested the release of additional bank accounts, representing that the cost of retaining counsel was proving more expensive than they had anticipated when they filed their motions. (Docket # 172). The additional accounts are the following:[5]

> • Canandaigua National Bank & Trust account number XXXXXX5179 ("CNB 5179") in the name of CAE in the sum of approximately $18,472;
>
> • Canandaigua National Bank & Trust account number XXXXXX5160 ("CNB 5160") in the name of CAE in the sum of approximately $41,431;
>
> • HSBC account number XXX80812-2 ("HSBC 80812-2") in the name of CAE in the sum of approximately $28,731;
>
> • Canandaigua National Bank & Trust account number XXXXXX8815 ("CNB 8815") in the name of CAE Distributors, Inc. in the sum of approximately $35,576.

(Docket # 172). Defendants argue that because the government's theory of forfeiture is the same for all of the seized accounts, it would not be prejudiced by inclusion of the additional accounts in the pending motions. (*Id*. at ¶ 6). The government opposes the defendants' request as untimely. (Docket # 178).

---

[5] Defendants also identify CNB 5136 as an additional account. (Docket # 172). In fact, that account was identified in defendants' original motions (*see* Docket # 178 at 2-6) and is included in the list in the preceding paragraph. Canandaigua National Bank & Trust account number XXXXXX2066 is not included in either list, however, despite defense counsel's mistaken belief that it was included among the original three accounts subject to these motions. (*Id*.).

# FACTUAL FINDINGS

Set forth below is a summary of the evidence introduced by the parties at the *Monsanto* hearing.

## I. The Indictment

The government introduced into evidence the pending indictment against the defendants. (Tr. 3; Docket # 1). The bank accounts at issue in these motions are specifically identified in the indictment's first forfeiture allegation, along with the sum of $4.1 million that the indictment alleges is the amount "involved in the money laundering offenses for which the defendants are charged." (Docket # 1). The indictment seeks forfeiture of those assets under 18 U.S.C. § 982(a)(1). (*Id.*).

The indictment charges that between 2002 and 2007 the defendants conspired with one another to defraud Xerox by billing it, through CAE – a company that contracted with Xerox to maintain Xerox's forklift equipment – for parts and services that were never provided. (*Id.* at ¶ 2). According to the indictment, in return for their participation in the scheme, the Xerox defendants received kickbacks from CAE. (*Id.*).

According to the indictment, the scheme operated in the following manner. "On most work days," Anthony Fretto went to the Xerox premises where seven of the defendants were employed by Xerox as mechanics and picked up old and used parts from them. (*Id.* at ¶ 4). Anthony Fretto took the parts back to CAE, where they were unloaded and placed on the main counter. Rather than replace or repair the parts, however, Anthony Fretto ordered that they be repackaged into new boxes and tagged with the purchase order and one of the mechanic's names. (*Id.*). LaVilla and Gerald Fretto "occasionally" assisted with unloading and repackaging the old

parts. (*Id*. at ¶ 11). The following day, Anthony Fretto delivered the same old, unrepaired parts to Xerox. (*Id*. at ¶ 5). In monthly invoices mailed to Xerox, CAE subsequently billed Xerox as if the part had been repaired or replaced. (*Id*. at ¶ 6). The invoices were paid by Xerox. (*Id*. at ¶ 7).

**II. <u>Stacer's Affidavit and Testimony</u>**

To further explain the charges and supporting evidence against the defendants, the government also introduced two sworn affidavits of Erin Stacer, the case agent. (Tr. 3; Docket # 110-1 and Ex. A). Counsel for the defendants called and cross-examined Stacer at the hearing.

Stacer testified that as part of her investigation, she interviewed several former CAE employees who stated that the practice of repackaging old and used parts into new boxes and delivering them to Xerox occurred on a daily basis. (Tr. 22, 35; Docket # 110-1 at 3-4). She further testified that she had compared invoices issued by CAE to Xerox for new parts against invoices issued to CAE by its parts suppliers and determined that the latter were "significantly less" than the former. (Docket # 110-1 at 4). Stacer also learned from Xerox that its internal investigation uncovered five old parts packaged in boxes that had been taped and tagged in the manner that one of the former CAE employees had described; a corresponding bill from CAE to Xerox for the parts was also found. (*Id*.).

One former CAE employee told Stacer that he had noticed that some of the same parts were being repackaged as often as twice a week. (Docket # 110-1, Ex. A at 25). In order to determine how often a particular used part was being repackaged, the employee began marking the part. According to the employee, some parts were marked ten times. (*Id*.). Stacer testified

that LaVilla "yelled at the employee to stop marking the parts, the Xerox parts that he was repackaging." (Tr. 31). In addition, other witnesses advised Stacer that LaVilla himself sometimes repackaged parts, as well as directed others to "hurry up and package these parts." (Tr. 34).

        Stacer testified that former employees whom she interviewed admitted that the Xerox mechanics picked up "kickbacks" from Gerald Fretto's home in return for their participation in the scheme. (Tr. 45, 47, 48, 50). The kickbacks were "basically any personal items [the Xerox mechanics] wanted, . . . anything from a dog to a tool to a race car part, anything they wanted." (Tr. 46).

### III. The Assets

        Stacer's December 2007 affidavit (Docket # 110-1, Ex. A) contains the following allegations concerning the seized bank accounts at issue in these motions. The government contends that the accounts are forfeitable because they were involved in illegal money laundering transactions and/or contain funds that are traceable to the fraudulent mail fraud scheme. Defendants elicited no testimony from Stacer at the hearing about the bank accounts other than testimony concerning the purpose for which CAE Distributors, Inc. was formed. (*See* n.6 *infra*).

#### A. CNB 2066 and CNB 5179 (in the name of CAE)

        The invoice payments from Xerox to CAE were deposited into CAE's Canandaigua National Bank & Trust account number XXXXXX2066 ("CNB 2066"). (*Id*. at 35-40). From June 2005 through July 2007, a total of approximately $2.868 million in check payments from Xerox to CAE were deposited into the account. (*Id*. at 37). Based upon Stacer's

investigation, she concluded that more than half of that amount represented payment for fraudulent charges, while some of the total represented payment for legitimate goods and services. (*Id*. at 33).

CNB 2066, in turn, funded CNB 5179, also in the name of CAE. (*Id*. at 35-40). According to Stacer, CNB 5179 was funded "solely" by deposits from CNB 2066. (*Id*. at 39). CAE used the funds in CNB 5179 to purchase new inventory and to satisfy payroll and operating expenses. (*Id*. at 35-40).

### B. CNB 2668, CNB 5136 and FNB 3581 (in the name of CAE)

Stacer's December 2007 affidavit explains that the source of the funds in CNB 5136 were customer credit card payments for goods purchased from CAE; CAE used funds from CNB 5179 (discussed in paragraph A above) to purchase the inventory of goods. (*Id*. at 46-50). CNB 2668, in turn, was funded solely by deposits from CNB 5136. (*Id*. at 49). Stacer's affidavit further explains that the source of the funds in FNB 3581 were transfers from certain CAE Citizens Bank accounts into which were deposited other customer credit card payments for goods purchased from CAE (which, as noted above, CAE bought with funds from CNB 5179). (*Id*. at 54-57).

### C. CNB 5160 and HSBC 80812-2 (in the name of CAE) and CNB 5195 (in the name of Anthony J. Fretto and Matthew P. LaVilla)

According to Stacer, the sole source of the funds in CNB 5160 and HSBC 80812-12 were deposits from CNB 2066 and CNB 5179, discussed in paragraph A above. (*Id*. at 40-42, 44-46). Funds in CNB 5160 were used not only to pay CAE's taxes, but also to pay defendants' personal taxes. (*Id*. at 41). From 2006 through June 2007, the sole source of funds

deposited into Canandaigua National Bank & Trust account number XXXXXX5195 ("CNB 5195") were checks written on CAE 5179, discussed in paragraph A above. From 2003 through 2005, CNB 5195 was funded by deposits of commission payments by U-Haul, Inc., for which CAE was an authorized dealer until 2005.

### D. CNB 8815 (in the name of CAE Distributors, Inc.) and CNB 5094 (in the name of Elsie and Matthew LaVilla)

CNB 8815 was opened in the name of CAE Distributors, Inc.[6] and substantially funded by two deposits – one from CNB 5136 and the other from a certificate of deposit that was purchased with funds from CNB 2668, which are discussed in paragraph B above. (*Id*. at 50-53). Anthony Fretto, Gerald Fretto and LaVilla withdrew funds from CNB 8815 to pay their personal debts and expenses, such as home mortgages and vehicles. (*Id*. at 51).

CNB 5094, a checking account in the name of Elsie and Matthew LaVilla, was substantially funded by a transfer from CNB 8815. (*Id*. at 53-54). LaVilla and his wife used the account to pay personal expenses, such as credit card and utility bills. (*Id*.).

## DISCUSSION

In *Monsanto*, the Second Circuit held that the Fifth and Sixth Amendments "considered in combination" require an adversarial, post-restraint, pretrial hearing to determine whether a seizure of assets necessary to retain counsel is adequately supported by probable cause. *United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir.), *cert. denied*, 502 U.S. 943 (1991);

---

[6] The government and defendants apparently dispute the purpose for which CAE Distributors, Inc. was formed. (*Compare* Tr. 55-61 *with* Docket # 175 at ¶ 6). My determination whether the government has demonstrated probable cause that the account is forfeitable, however, does not turn on the original purpose for which the corporation was formed.

*United States v. Morrison*, 2006 WL 2990481, *6-7 (E.D.N.Y. 2006).  At the hearing, the government bears the burden of establishing "probable cause that (a) the defendant committed crimes that provide a basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable."  *Monsanto*, 924 F.2d at 1203.

The Supreme Court has counseled that the probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).  Probable cause requires no more and no less than a "reasonable ground for belief of guilt."  *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).  To determine probable cause, a court must consider "the totality of the circumstances."  *In re Seizure of All Funds in Accounts in the Names Registry Publ'g, Inc.*, 68 F.3d 577, 580 (2d Cir. 1995) (quoting *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987)).  Finally, "probable cause . . . 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'"  *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (quoting *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990)).

### I. Probable Cause – Criminal Activity

I turn first to whether probable cause exists to believe that defendants Matthew LaVilla and Gerald Fretto have committed the crimes with which they are charged.  Taken together, the indictment, Stacer's affidavits and her testimony establish ample probable cause to believe that Anthony Fretto conspired with various Xerox mechanics to charge Xerox for new

parts that CAE did not deliver.[7] LaVilla and Gerald Fretto argue that the evidence is inadequate, however, to establish that they participated in the alleged fraudulent scheme. (Docket ## 179, 180).

A defendant's participation in and knowledge of a conspiracy "may be established through circumstantial evidence." *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007)), *cert. denied*, 130 S. Ct. 142 (2009). *Accord United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010). "[A] single act may be sufficient for an inference of involvement [in a conspiracy] . . . if the act is of a nature justifying an inference of knowledge." *United States v. Huezo*, 546 F.3d at 180 (quoting *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975)).

Here, the indictment alleges that LaVilla and Gerald Fretto – who, with Anthony Fretto, are the sole, equal shareholders of CAE – both "occasionally" unloaded the old, unrepaired parts from Anthony Fretto's truck and placed them on CAE's counter to be repackaged, as well as assisted in repackaging parts. Stacer testified that when LaVilla observed an employee marking parts that had been returned multiple times, LaVilla yelled at the employee to stop marking the part. Stacer further testified that Gerald Fretto delivered kickbacks to the Xerox mechanics at his home. Reasonable inferences of LaVilla's and Gerald Fretto's knowledge and participation in the alleged mail fraud scheme may be drawn from this evidence.

---

[7] In making this finding, I recognize that the Court is not bound by the grand jury's determination of probable cause. *Monsanto*, 924 F.2d at 1200. My probable cause finding does not rest exclusively or even principally upon the indictment; rather, it rests upon Stacer's sworn assertions and testimony, in addition to the indictment.

I further find that the record establishes probable cause to believe that Gerald Fretto and LaVilla conspired to engage in money laundering and benefitted financially from the scheme. Specifically, Xerox's payments on the fraudulent invoices were deposited into CNB 2066, which, through a series of transfers and deposits, funded the other seized accounts at issue including CNB 8815, which both Gerald Fretto and LaVilla used to pay substantial personal expenses, such as the satisfaction of mortgages. (Docket # 1 at Counts 4-12).

On this record, I find probable cause to believe that Gerald Fretto and LaVilla committed the crimes with which they are charged in the indictment.

## II. Probable Cause – Forfeitability of Accounts

I turn next to the forfeitability of the bank accounts. In order to establish probable cause that the bank accounts are forfeitable, the government must show "a nexus between the illegal conduct and the seized property. The government is not required to link a bank account to a particular illegal transaction, but it must have probable cause to connect the account to criminal activity." *In re Seizure of All Funds in Accounts in the Names Registry Publ'g, Inc.*, 68 F.3d at 580 (quoting *Marine Midland Bank, N.A. v. United States*, 11 F.3d 1119, 1126 (2d Cir. 1993) (citations omitted)). *See also United States v. Daccarett*, 6 F.3d 37, 56 (2d Cir. 1993) ("the government must demonstrate only a 'nexus' between the seized property" and illegal activity), *cert. denied*, 510 U.S. 1191 (1994).

The government maintains that the bank accounts at issue are forfeitable under two theories. Under the first theory, the government contends that the bank accounts are forfeitable under 18 U.S.C. § 982(a)(1) as property "involved in" a money laundering offense or

12

"traceable to such property." 18 U.S.C. § 982(a)(1). (Docket # 1 at 26). "The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the money laundering offense." *United States v. Nicolo*, 597 F. Supp. 2d 342, 347-48 (W.D.N.Y. 2009) (quoting *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271 (E.D.N.Y. 2005)). "[P]roperty 'traceable to' means property . . . the acquisition [of which] is attributable to the money laundering scheme rather than from money obtained from untainted sources." *Id*. at 348 (quoting *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998), *cert. denied*, 528 U.S. 1139 (2000)). *See also United States v. Voigt*, 89 F.3d 1050, 1087 (3d Cir.) ("the term 'traceable to' means exactly what it says . . . that the property has some nexus to the property 'involved in' the money laundering offense"), *cert. denied*, 519 U.S. 1047 (1996).

Under its second theory, the government contends that the bank accounts are forfeitable under 18 U.S.C. § 981(a)(1)(C) as property derived from proceeds traceable to mail fraud, a specified unlawful activity within the meaning of the statute. (Docket # 1 at 30). Under that statute, "[p]roceeds are property that a person would not have but for the criminal offense." *United States v. Nicolo*, 597 F. Supp. 2d at 346 (quoting *United States v. Grant*, 2008 WL 4376365, *2 n.1 (S.D.N.Y. 2008)).

Upon review of the record, I find that the government has met its burden of demonstrating probable cause to believe that the challenged seized bank accounts are forfeitable as property involved in money laundering – the government's first theory, which is the basis of

the first forfeiture allegation in the indictment.[8] As recounted above, the funds Xerox paid to CAE as a result of the fraudulent scheme (nearly $1.5 million between 2005 and 2007 alone) were deposited into CNB 2066, which, in turn, directly and exclusively funded CNB 5179. These accounts, in turn, funded several seized accounts. In addition, CNB 5179 was used to purchase inventory, which was then sold to customers who paid for the inventory through credit cards. Funds representing those credit card purchases were then deposited to CNB 2668 and 5136. These accounts, in turn, funded CAE Distributors account CNB 8815 – an account from which defendants withdrew money to pay personal expenses. In addition, CNB 8815 funded CNB 5046, the personal checking account of LaVilla and his wife. This evidence adequately establishes probable cause to believe that the seized accounts at issue in these motions, the aggregate total of which is substantially less than the sum that Xerox paid CAE in connection with fraudulent billings, constitute property involved in money laundering offenses or traceable to such property under 18 U.S.C. § 982(a)(1). *See Nicolo*, 597 F. Supp. 2d at 351, 354 ("the corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder, . . . [which] then, are subject to forfeiture"; "the fact that [the] bank accounts may have contained some untainted funds cannot itself defeat the government's forfeiture claim") (internal quotation omitted).[9]

---

[8] Because I find probable cause that the accounts are forfeitable under the first theory, I do not reach the government's second theory – 18 U.S.C. § 981(a)(1)(C) – cited in the civil forfeiture complaint.

[9] Whether all the funds in each of the accounts will ultimately be subject to forfeiture is "an issue for another day, in another proceeding." *Id*. at 355.

## CONCLUSION

For the reasons discussed above, I find that the government has satisfied its burden of establishing probable cause to believe that defendants committed the crimes with which they are charged, specifically, conspiracy to commit mail fraud and money laundering, and related substantive offenses, in violation of 18 U.S.C. §§ 1341, 1349, 1956(h) and 1957. I further find that the government has established probable cause to believe that the challenged bank accounts are forfeitable under 18 U.S.C. § 982(a). Accordingly, defendants' motions to release the seized funds for the purpose of retaining counsel **(Docket ## 67, 75, 76, 172)** are **DENIED**.

In addition, defendant's motion for production of Stacer's notes, memoranda, spreadsheets and grand jury testimony **(Docket # 179)** is **DENIED**.

**IT IS SO ORDERED.**

                                                        *s/Marian W. Payson*
                                                          MARIAN W. PAYSON
                                                     United States Magistrate Judge

Dated: Rochester, New York
        February 1, 2012